UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Dr. Jean Montes,

    Plaintiff,

v.                                                             Civ. No. 05-866 (JNE/SRN)
                                                            ORDER

Greater Twin Cities Youth Symphonies
(GTCYS),

    Defendant.

Stephen M. Thompson, Esq., Friederichs & Thompson, P.A., appeared for Plaintiff Dr. Jean Montes.

Bradley J. Lindeman, Esq., Meagher & Greer, PLLP, appeared for Defendant Greater Twin Cities Youth Symphonies (GTCYS).

Dr. Jean Montes brought this action against his former employer, Greater Twin Cities Youth Symphonies (GTCYS), alleging that GTCYS discriminated against him in violation Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C §§ 2000e to 2000e-17 (2000). The case is before the Court on GTCYS's Motion for Summary Judgment. For the reasons set forth below, the Court grants the motion.

**I.    BACKGROUND**

GTCYS is a non-profit organization located in Minneapolis, Minnesota whose mission is to provide a rigorous and inspiring orchestral music experience for young musicians. The organization is governed by a volunteer Board of Directors, which hires an Executive Director, who supervises all administrative staff; and an Artistic Director, who is responsible for the artistic direction of the organization and supervises all artistic staff. The Executive and Artistic

1

Directors function together in a dual-leadership arrangement with each reporting directly to the Board.

Montes was born and raised in Haiti and immigrated to the United States in 1990. He is black. He obtained a bachelor of arts degree in musical performance from Duquesne University, a master of arts in music education from the University of Akron, and a doctorate of musical arts from the University of Iowa in 2003. Prior to working with GTCYS, Montes held several conductor positions and was the musical director for the Greater Cedar Rapids Youth Symphony.

In the summer of 2002, GTCYS's Artistic Director resigned, prompting a national search for a replacement that yielded more than one hundred applicants. The search culminated in April 2003 when GTCYS hired Montes to serve as its Artistic Director, effective July 14, 2003. GTCYS provided Montes a signing bonus, a disbursement for moving expenses, and agreed that Montes would be allowed time to participate in a music camp each summer in Haiti. Additionally, Montes agreed to work for GTCYS as an independent contractor for two weeks in June 2003 in connection with auditions for the placement of students in the orchestras that would begin in September 2003. Montes was hired as an at-will employee.

To assist Montes in moving to the Twin Cities, the Board formed a transition committee. One Board member, Cynthia Cargill, suggested that an African-American subcommittee be formed to assist Montes' assimilation into the community. GTCYS's acting Executive Director, Chris Corcoran, corrected Cargill that Montes was Haitian and the suggestion was not implemented. Members of the transition committee also expressed concern that Montes might be difficult to understand given his accent and soft spoken delivery. The transition committee considered finding a mentor to address Montes' speech, but never implemented the idea.

Between the June auditions and Montes' official start date, Corcoran resigned, leaving GTCYS without an acting Executive Director. On Montes' arrival, no Board member was present at the workplace to welcome Montes to the organization. One of Montes' first actions as Artistic Director was to reduce the number of GTCYS's orchestras from eight to six. This decision upset a number of people, as it affected student placements and cost some conductors their positions. In August 2003, Montes met with the incoming president of the Board, Charles Fuess, to discuss the restructuring of the orchestras. During this meeting, Montes alleges that Fuess told him that he was considered *la bête noire* of the organization following the elimination of two orchestras. Fuess admits that he used the phrase *la bête noire* in reference to others' perception of Montes' standing in the organization, but contends that it was Montes who first used the phrase. According to Montes, Fuess referred to him as *la bête noire* several more times between September 2003 and May 2004.

Soon after Montes started, GTCYS hired David Ranheim to serve as its interim Executive Director. According to Montes, Ranheim told Montes that he lacked the persona of an Artistic Director, which Montes understood to be traditionally European. Additionally, Montes alleges that Ranheim insisted on weekly meetings between the two, and stated that as a "young, African conductor," Montes required Ranheim's guidance. GTCYS hired Gwendolyn Freed to replace Ranheim as Executive Director in January 2004.

On May 11, 2004, Montes sent an e-mail to GTCYS members congratulating them on their performances in a concert held the previous week. In the e-mail, Montes forwarded an informational brochure and registration form for a summer orchestra camp known as Allegro, which would be held in Wayzata, Minnesota. The brochure indicated that Montes was a member of the Allegro staff. Freed responded to Montes' e-mail the next day, stating that she was

3

concerned that Montes' active promotion of Allegro could be construed as a conflict of interest. Freed expressed her belief that Allegro competed directly with GTCYS's summer program and questioned whether Montes had informed the Board of his involvement in Allegro. Freed blind-copied members of the Board, including Fuess, on her e-mail response to Montes. Fuess met with Montes to discuss the substance of Freed's response, and then referred the matter to the GTCYS Executive Committee.

The Executive Committee prepared a written counseling report highlighting their expectation that Montes consult with the Board President before participating in or promoting any outside organization that may impact GTCYS. The counseling report referred to GTCYS's outside employment policy, contained in its employee handbook:

> Outside employment may be permitted, provided there is no conflict of interest or negative effect upon the employee's productivity for GTCYS. The Executive Director, or the Board of Directors, must be notified of any outside employment. Any variations from the normal week at GTCYS, as a result of outside employment, must be approved by the Executive Director.

On May 24, 2004, Fuess and Jonathan Lewis, another member of the Executive Committee, presented the counseling report to Montes. The counseling report contained a signature line to indicate receipt. Montes refused to sign the report without an opportunity to consult legal counsel. Montes stated that he was concerned that the counseling report altered the terms of his employment and conflicted with his offer letter, which stated that "as part of [Montes'] job, [Montes] will be permitted to engage in other musical or educational endeavors which do not interfere with [Montes'] responsibilities at GTCYS." Montes believed that he personally had the discretion to determine whether an outside activity constituted a conflict of interest and maintained that Allegro presented an opportunity to promote the interests of GTCYS. During the meeting with Fuess and Lewis, Montes also stated that he was not an

4

employee, but the Artistic Director, equivalent in stature to the Board President. According to Montes, Fuess again referred to Montes as *la bête noire* during the meeting.

On July 1, 2004, Montes addressed the Board, expressing his concern that the current organizational structure was ineffective. Montes stated that he felt misled by Freed and believed that he was not required to seek the Board President's permission before engaging in outside activities. Montes stated that he did not wish to resign, but raised the possibility that he could continue as an independent contractor, responsible solely for conducting the symphony. Montes also indicated that he was willing to sign the counseling report, but reiterated his belief that it changed the terms of his employment. After Montes left the meeting, the Board discussed whether GTCYS should continue to operate with Montes as its Artistic Director. Several Board members expressed their understanding that Montes had suggested that he would resign as Artistic Director if the organizational structure were not changed. The Board then voted to inform Montes that it would accept his resignation. The Board also voted to terminate Montes' employment, in the event that he would not tender his resignation.

On July 2, 2004, Fuess and Lewis met with Montes to discuss the Board's decision. They informed Montes of the Board's vote and told him that if he wanted to resign, the Board would accept his resignation. Montes never tendered his resignation; his final day of employment was July 28, 2004, the date of GTCYS's final summer performance. On August 26, 2004, Fuess sent a letter to Montes providing a written statement of the reason for his termination. In the letter, Fuess writes:

> The reason for your termination was your continued unwillingness to cooperate with the GTCYS Board and other staff members regarding the overall operations of the organization. This unwillingness to cooperate was most recently noted in your refusal to sign the counseling report presented to you on May 24, 2004 and in your statement to the Board on July 1, 2004 that you would resign

5

> your position rather than continue in the dual-leadership arrangement into which you were hired.

GTCYS eventually hired Marlene Pauley, who is Caucasian, to replace Montes. On September 10, 2004, Montes filed a charge of racial discrimination with the Equal Employment Opportunity Commission (EEOC). After the EEOC dismissed the charge, Montes commenced this litigation. Montes alleges that GTCYS terminated his employment because of his race, color, and national origin. Additionally, Montes alleges that GTCYS subjected him to "a continuous pattern of harassment and hostile work environment because of his race, color and national origin" in violation of 42 U.S.C. § 2000e-2(a).

## II.   DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      Discriminatory termination**

Title VII makes it an unlawful employment practice for an employer to "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Montes claims that GTCYS terminated his employment based on his race, color, and national origin.  A plaintiff may establish a violation of Title VII's prohibition against discriminatory termination either through direct or indirect evidence.  *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 278-79 (1989) (O'Connor, J., concurring)).

**1.      Direct evidence of discrimination**

Evidence is direct if it establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision.  *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (citing *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)).  "'[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'"  *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) (quoting *Price Waterhouse*, 490 U.S. at 277).

As direct evidence of discrimination, Montes points first to Cargill's suggestion that an African-American subcommittee be formed to help Montes assimilate into the Twin Cities and second to Fuess's use of the phrase *la bête noire* in reference to Montes.  Although both Cargill and Fuess are properly considered decisionmakers because they participated in the Board's decision to terminate Montes, their comments cannot constitute direct evidence of discrimination if it is determined that the statements were unrelated to the decisional process itself.

7

The Court turns first to Montes' assertion that Cargill's suggestion reveals that the Board had a discriminatory mindset. In this regard, it is appropriate to consider the context in which the comment was made. *See Twymon*, 462 F.3d at 934 (finding that racially offensive and misguided comments made in the context of attempting to promote a Title VII plaintiff's career are not direct evidence of discrimination, despite the fact that they were made by decisionmakers). Here, the Board had just hired Montes after considering more than one hundred other applicants and had formed a committee to ease his transition. Although Cargill's comments reveal that she had taken notice of the fact that Montes was not white, Title VII does not prohibit taking note of race, color, or national origin, but of discriminating against a person on the basis of those characteristics. In this case, the context reveals that the idea floated by Cargill – to establish an African-American subcommittee to assist Montes' transition to the community – was intended to enhance, rather than harm Montes' experience with GTCYS. The organization is located in Minnesota, which any reasonable jury would conclude is historically predominantly white. Given this history, it is reasonable for an employer to consider it a challenging environment for professionals of color relocating to the state. As a matter of law, an effort to overcome that challenge and ease a transition would not by itself be direct evidence of an intent to discriminate. Nothing in the context of the Cargill's suggestion could support a finding by a reasonable jury that her comment was not made for that well-intentioned purpose. The fact that Cargill mistakenly referred to Montes as African-American when in fact he is from Haiti is of essentially no consequence. Many people are uncomfortable discussing issues of race and believe that "African-American" is preferable to "black." For these reasons, especially that the comment was made in the context of *hiring* rather than *firing*, the Court cannot count Cargill's comment as direct evidence of discrimination.

The Court turns next to the *bête noire* issue. Montes argues that Fuess's use of the phrase *la bête noire* establishes direct evidence of discrimination because it is a racial slur. The English language usage of the term is derived from the French phrase *la bête noire*, which, according to various sources, is literally translated as "the black beast." According to the Oxford English Dictionary (OED), the phrase *bête noire* means not only "black beast" in French, but also refers figuratively to an "insufferable person." II *Oxford English Dictionary* 147 (2d ed. 1989) ("**bête noire** . . . [Fr., lit. 'black beast'; *fig.* insufferable person.]"). In English, the term is defined as "[a] person or thing that is the bane of a person or his life; an insufferable person or thing; an object of aversion." *Id.; see also The American Heritage Dictionary of the English Language* 131 (3d ed. 1993) ("[o]ne that is particularly disliked or that is to be avoided"). Examples of English usage are provided in the OED[1] and the American Heritage Dictionary of the English Language.[2] Of course, the English language is constantly evolving and a word or phrase can take on a meaning that is not reflected in a dictionary, as anyone familiar with popular – especially teenage – culture can attest. Montes, however, has cited to no example of the phrase having attained a secondary, racial meaning and the Court's research reveals no such example.[3]

---

[1] "**1844** THACKERAY *Barry Lyndon* xvii. in *Fraser's Mag.* XXX. 235/1 Calling me her bête noire, her dark spirit, her murderous adorer, and a thousand other names indicative of her extreme disquietude and terror. **1850** *Househ. Words* 6 July 359/1 You or any one else's *bête noire* is apt to get polished off with a few extra touches of blacking. **1860** W. H. RUSSELL *Diary India* I. 209 Jung Bahadoor, who is evidently the present *bête noir* of our General's life. **1866** MRS. H. WOOD *Elster's Folly* xiv, It was the bête noire of Clerk Gum's life. **1905** *Spectator* (Lit. Suppl.) 28 Jan. 118/2 [His] *bête-noire* is the submission of military affairs to the control of 'political exigencies'. **1961** L. MUMFORD *City in History* x. 290 As for the disposal of ordure, this has always been the bête noire of close urban settlements." II *Oxford English Dictionary* 147.

[2] "'Tax shelters had long been the bête noire of reformers' (Irwin Ross)." *The American Heritage Dictionary of the English Language* 131.

[3] The phrase does have an unrelated meaning in English, referring to a dense flourless torte. *See, e.g.*, Jason Aronen, *Cover Recipe – La Bête Noire*, Bon Appétit, Sept. 2006, at 146,

Fuess does not dispute that he used the phrase when speaking to Montes, but claims he used the phrase in its commonly accepted English sense. Montes first language is French; the record does not reveal whether Fuess is fluent in French, although he acknowledges that he understood the literal translation of *la bête noire* at the time he used the phrase. There is no question that all of the conversations in which the phrase *la bête noire* was used were conducted in English.

Had Fuess used the English words "black beast" to describe Montes, Montes' argument that the phrase constitutes direct evidence of discrimination would be different. *La bête noire*, however, has been incorporated into the English language with a race-neutral meaning and carries no discriminatory connotation. Given the context in which Fuess used the phrase, the only reasonable conclusion is that the phrase was used in the conventional English-language way. The first time that the phrase was used, in an August 2003 meeting, Fuess told Montes that he understood that Montes was considered *la bête noire* of the organization for the restructuring of the orchestras, a restructuring that engendered considerable angst along with some job losses. Montes concedes that each subsequent use of the phrase referred to others' perception of his standing in the organization. Fuess is not alleged to have made any other statement that could arguably refer to race.

Montes argues that Fuess's use of the phrase *la bête noire* not only referred to Montes' standing as one that is particularly disliked within the organization, but also "gave [Montes] a perception that [Montes] was black and looked upon as so." As a matter of law, however, a Title

---

*available at* http://www.wilderoastcafe.com/about/2006-08_art_bon_appetit.php (featuring a recipe for flourless chocolate cake as prepared by the executive chef of the Wilde Roast Café, located in Minneapolis, Minnesota); Epicurious, http://www.epicurious.com/recipes/recipe_views/views/235831 (last visited Nov. 22, 2006) (also featuring the Wilde Roast Café recipe for *La Bête Noire*).

VII plaintiff's subjective beliefs concerning allegedly discriminatory remarks cannot be considered direct evidence of discrimination. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) ("if the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed"). Considering the objectively understood meaning of the term *la bête noire* in conjunction with the context of the conversations in which the phrase was used, the Court concludes that its use here does not constitute direct evidence of discrimination.

### 2. Indirect evidence of discrimination

To assess an employment discrimination claim based on indirect evidence of discrimination, the Court applies the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03 (1973). *See Twymon*, 462 F.3d at 934. "Under this framework, a Title VII plaintiff has the initial burden of establishing a prima facie case of discrimination." *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 656 (8th Cir. 2003). A plaintiff establishes a prima facie case by showing that: (1) he was a member of a protected class; (2) he was meeting the legitimate job expectations of his employer; (3) he experienced an adverse employment action; and (4) that circumstances exist which give rise to an inference of discrimination. *See Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004) (citing *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir. 1994))

GTCYS argues that Montes has failed to establish that any similarly situated employee outside of the protected classes was treated differently. Montes responds, however, that the fact that GTCYS hired a Caucasian to replace him satisfies the fourth element. Additionally, Montes argues that he was treated differently than similarly situated employees. The test to determine if

one is similarly situated varies at each stage of a *McDonnell Douglas* analysis. "At the prima-facie stage it is "not onerous," however at the third stage (proving pretext) it is "rigorous." *Wheeler*, 360 F.3d at 857 (citation omitted). Considering the low threshold at the prima-facie stage, the Court concludes that Montes has established the requisite elements of a prima-facie case.

When a prima facie case of discrimination is established, the "burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for firing the plaintiff." *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005). If the employer makes such a showing, the burden again shifts and plaintiff must demonstrate that the stated non-discriminatory rationale was a pretext for intentional discrimination. *See id.* In this case, GTCYS has articulated several legitimate, non-discriminatory reasons for Montes' termination, including the fact that Montes was an at-will employee, that Montes refused to accept the Board's directive that he notify the Board prior to accepting outside employment, and that Montes was unwilling to cooperate with the Board and GTCYS staff members regarding the overall operations of the organization.

To prove pretext, Montes must both discredit GTCYS's asserted reasons for termination and show that circumstances permit drawing the reasonable inference that the real reason for terminating Montes was his race, color, or national origin. *See Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005). Montes argues that he did not refuse to accept the Board's directive to notify it prior to accepting outside employment and that he was willing to cooperate with the Board or other staff members regarding the operation of the organization. Montes notes that he never refused to sign the counseling report and that he told the Board that he would do so if the Board so desired. Montes does not, however, dispute that in May 2004, a conflict arose

between Montes and the Board regarding his duties to report to the Board. GTCYS's employee handbook indicates that outside employment may be permitted, provided there is no conflict of interest and that the employee first notify either the Executive Director or Board. When Montes was presented with the counseling report and told that he must notify the Board before accepting outside employment, he responded by stating that he did not need Board authority to participate in Allegro and that he had the discretion to determine what activity constituted a conflict of interest. When addressing the Board on July 1, 2004, Montes reiterated his position, stating that the counseling report changed the terms of his employment. Given the circumstances, the Court concludes that Montes has failed to discredit GTCYS's stated reasons for termination.

Even if Montes could show that the stated reasons for his termination were untrue, he must also establish that the falsehood was designed to disguise discriminatory intent. *See Floyd v. Mo. Dept. of Soc. Servs.*, 188 F.3d 932, 937 (8th Cir. 1999). Montes attempts to provide evidence capable of supporting an inference that his termination was motivated by his race, color, or national origin by drawing from the disparate treatment of similarly situated employees. *See Putman*, 348 F.3d at 376. Montes argues that Pauley, who succeeded Montes as Artistic Director, and Ranheim and Freed, who were supposed to be his equals in their roles as Executive Director, were treated differently than him. In support of this position, Montes asserts that Pauley participated in the Allegro camp in the summer of 2005, but was not disciplined by the Board. Additionally, Montes claims that he complained to the Board that Ranheim was treating Montes as a subordinate, but the Board failed to take any action to correct the situation. Finally, Montes contends that the Board favored Freed by offering her a parking space close to the building that it had previously denied to Montes, providing her formal performance reviews not given to Montes, allowing her more freedom in her decisions, and most significantly, failing to

discipline her after Freed promoted a music camp similar to Allegro in Boston that resulted in the loss of at least one student from GTCYS.

With respect to Ranheim, Montes does not allege that the Board disciplined Montes for treating his peers as subordinates; therefore, the fact that Ranheim was not disciplined after Montes' complaints does not indicate that the two were treated differently. Here, Montes was accused of, and ultimately terminated for, failing to notify the Board before promoting a potentially conflicting music camp. While Montes claims that other directors promoted and participated in potentially competing music camps, he does not allege that they did so without the prior knowledge or approval of the Board. Accordingly, Montes has failed to establish that the other directors were similarly situated with respect to participating and promoting music camps outside of GTCYS. Additionally, Montes claims that the Board exhibited favoritism to Freed because her decisions were not monitored as closely as his own. Montes, fails, however, to cite any specific examples to support this allegation. As such, these unsubstantiated and conclusory allegations are insufficient to support an inference of pretext. *See Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998). Furthermore, Montes has failed to show that the Board's grant of a better parking space and formal evaluations to Freed is guided by any discriminatory animus. That Freed received a better parking space and formal evaluations may be sufficient to establish a prima facie case, but does not satisfy the more rigorous analysis necessary to show pretext. *See Wheeler*, 360 F.3d at 857.

Because Montes has presented no evidence debunking GTCYS's rationale for termination, nor established that the stated reasons were designed to disguise discriminatory intent, the Court concludes that Montes has not met his burden of showing that the stated non-

discriminatory rationale was a mere pretext for discrimination. Accordingly, Montes has failed to establish that his claim of discriminatory termination should survive summary judgment.

**B.     Hostile work environment**

Montes also asserts a claim of racial harassment and a hostile work environment under Title VII. To establish a hostile work environment claim, the plaintiff must establish that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it. *See Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). Harassment is actionable only if it alters the conditions of the victim's employment and creates an abusive working environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). When determining whether a work environment is hostile or abusive, a court examines all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Al-Zubaidy,* 406 F.3d at 1038. Harassment standards are demanding. *Id.* Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Id.* at 1039.

In this case, Montes alleges that he was subjected to numerous acts of harassment throughout his employment, including: the repeated use of the phrase *la bête noire* by Fuess; the statement by Ranheim that Montes did not have the persona and appeal of an artistic director; statements by Board members that they did not want a black man in the artistic director position;

15

a suggestion by the Board that Montes could benefit from an African-American subcommittee on assimilation; discussions by the Executive Committee centered on Montes' affiliation with Bill Jones, GTCYS's founder who is black; and unjustifiable attacks by the Board on Montes' speech pattern.

   Turning first to Montes' allegation that Board members stated that they did not want a black man to serve as the artistic director, the Court notes that this allegation appears only as a bullet point in the section on hostile work environment of Montes' memorandum in opposition to GTCYS's motion for summary judgment.  Montes did not raise the allegation as support for his arguments attempting to establish direct or indirect evidence of discrimination.  Nor was the allegation addressed at oral argument, where counsel for Montes noted that the primary focus of the discriminatory intent inquiry was the use of the phrase *la bête noire*.  The only support for this allegation appears in Montes' deposition testimony, in which Montes stated that two Board members, Chirs Corcoran and Jackie Regis, told him that two other Board members had stated that they did not want a black man as artistic director.  This allegation is based solely on hearsay, not subject to any identifiable exception.  Although there is no evidence of Regis's response in the record, Corcoran denied in her deposition testimony that she ever heard a Board member state that they did not want a black person as the artistic director.  Montes' claim that Board members stated that they did not want a black man to serve as the artistic director is not supported by any admissible evidence.  Accordingly, the Court concludes that Montes' unsupported allegation is insufficient to defeat summary judgment.  *See Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (finding that inadmissible hearsay may not be used to defeat summary judgment); s*ee also Hill v. St. Louis Univ.*, 123 F.3d 1114, 1119 (8th Cir. 1997)

(holding that unsupported allegations of employer discrimination are not competent to defeat summary judgment).

Except for the statements made by Fuess and Ranheim to Montes, the remainder of the allegations of workplace harrassment occurred without Montes present. In each instance, Montes only learned of the substance of the allegations after his termination. As such, Montes could not have been subjected to unwelcome harrassment in the workplace based upon the substance of these allegations. Because exposure to unwelcome harrassment is a necessary element of a hostile workplace claim and requires a plaintiff to show that he experienced the unwelcome harrassment, the Court concludes that the allegations of statements made outside the presence of Montes do not support his claim.

The Court turns next to the statements made by Ranheim and Fuess. Montes alleges that the repeated use of the phrase *la bête noire* by Fuess and the statement by Ranheim that Montes did not have the persona and appeal of an artistic director supports his claim of hostile work environment. To establish a hostile work environment claim, a plaintiff must show that he was subjected to harassment that affected a term, condition, or privilege of employment. *See Al-Zubaidy*, 406 F.3d at 1038. To alter the terms and conditions of one's employment, conduct must be severe and pervasive, both objectively and subjectively. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005). Montes alleges that Ranheim's comment occurred only once, and although Montes alleges that Fuess repeatedly used the phrase *la bête noire*, he could only recall three specific instances. Montes does not claim to have complained about the phrase to Fuess or any other member of the Board. As for the comments by Fuess, the Court has already discussed the fact that the phrase *la bête noire* has been incorporated into English with a race-neutral meaning. Similarly, Ranheim's comment that Montes lacked the persona and appeal

17

of an artisitic director is not overtly racist.  That Montes might have personally perceived the comments by Fuess and Ranheim as racist or discriminatory is of no consequence.  A plaintiff's subjective belief or speculation that statements are discriminatory does not establish a claim of hostile work environment.  *See Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 567 (8th Cir. 2000).  Furthermore, the comments made by Fuess and Ranheim are not nearly as severe as others that have proved insufficient to support a claim of hostile work environment. *See, e.g., Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759-60 (8th Cir. 2004) (finding that the use of offensive racial slurs did not not render the work environment objectively hostile); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002) (holding that racist graffiti, including drawings of "KKK," a swastika, and a hooded figure on the walls of the employer's men's restroom constituted inexcusable behavior, but were neither severe nor pervasive enough to create a hostile work environment).  No reasonable juror could find that the remarks Montes complains of were sufficiently severe or pervasive to alter the terms or conditions of his employment.  Accordingly, the Court concludes that Montes has failed to establish that his claim of hostile work environment should survive summary judgment.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. GTCYS's Motion for Summary Judgment [Docket No. 12] is GRANTED.

2. Montes' Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: November 22, 2006

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge